UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| PATRICIA A. BRODIE, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 2:16-CV-479 |
| | § | |
| CAROLYN W COLVIN, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION

Plaintiff Patricia Brodie brought this action on October 28, 2016, seeking review of the final decision of the Commissioner of the Social Security Administration determining she was not disabled. On June 23, 2017, Plaintiff filed a Brief in Support of Claim, which is construed as a Motion for Summary Judgment. (D.E. 7). On July 28, 2017, Defendant filed a Responsive Brief. (D.E. 8). Plaintiff filed a Reply on August 15, 2017. (D.E. 11). For the reasons that follow, it is respectfully recommended that Plaintiff's Motion for Summary Judgment be **DENIED**, the Commissioner's determination be **AFFIRMED**, and Plaintiff's cause of action be **DISMISSED**.

## I.  JURISDICTION

The Court has jurisdiction over the subject matter and the parties pursuant to 42 U.S.C. § 405(g).

## II.    BACKGROUND

Plaintiff protectively filed her initial claim for disability insurance benefits on July 19, 2013, alleging a disability onset date of June 1, 2010,[1] due to right arm numbness, headaches, and back problems. (D.E. 5-6, Pages 2-4 and D.E. 5-7, Page 5).  Plaintiff's application was denied upon initial consideration and, at Plaintiff's request, a hearing was held before an administrative law judge ("ALJ") on April 6, 2015, at which Plaintiff and a vocational expert ("VE") testified.  (D.E. 5-3, Pages 19-21 and 35-75).  The ALJ issued an unfavorable decision on July 2, 2015, finding Plaintiff not disabled.  (D.E. 5-3, Pages 22-30).  Plaintiff requested the Appeals Council review the ALJ's decision, and the Appeals Council denied her request for review on September 9, 2016, making the ALJ's determination the final decision of the Commissioner under 42 U.S.C. § 405(g).  (D.E. 5-3, Pages 2-4 and 15-17).  Plaintiff timely filed this action on October 28, 2016, seeking review of the Commissioner's final decision.  (D.E. 1, Case No. 2:16-mc-1163).  The undersigned has reviewed the entire record.

## III.    APPLICABLE LEGAL STANDARDS

Judicial review of the Commissioner's decision regarding a claimant's entitlement to benefits is limited to two questions: (1) whether substantial evidence supports the Commissioner's decision; and (2) whether the decision comports with relevant legal standards.  *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*; *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  The burden has been

---

[1]Plaintiff later amended her alleged onset date to June 2011.  (D.E. 5-3, Pages 48-51 and 64).

described as more than a scintilla, but lower than a preponderance. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). A finding of "no substantial evidence" occurs "only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988) (citations omitted).

In applying the substantial evidence standard, the Court scrutinizes the record to determine whether such evidence is present. But the Court does not reweigh the evidence, try the issues de novo or substitute its judgment for that of the Commissioner. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citations omitted). It is incumbent upon the Court to look at the evidence as a whole and take into account the following factors: (1) objective medical evidence or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and others who have observed him; and (4) the claimant's age, education and work history. *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citations omitted).

In evaluating a disability claim, the Commissioner follows a five-step process to determine whether (1) the claimant is presently working; i.e. engaged in substantial gainful activity; (2) the claimant's ability to work is significantly limited by a physical or mental impairment; (3) the claimant's impairment meets or equals an impairment listed in the appendix to the regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the claimant, if determined to not have the residual functional capacity ("RFC") to perform past relevant work, can presently perform other relevant work consistent with claimant's age, education, work experience and RFC. *Martinez v.*

*Chater*, 64 F.3d 172, 173-174 (5th Cir. 1995); 20 C.F.R. § 404.1520; *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

A finding of disability or no disability at any step is conclusive and terminates the analysis. *Greenspan*, 38 F.3d at 236. The claimant bears the burden of proof for the first four steps. *Bowling*, 36 F.3d at 435. At Step Five, the burden initially shifts to the Commissioner to identify other work the applicant is capable of performing. *Id*. Once the Commissioner makes the requisite showing, the burden shifts to the claimant to rebut the Commissioner. *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002). If the Commissioner can show that the claimant can perform other substantial work within the national economy, the claimant is adjudged not to be disabled. *Id.*; *see also* 20 C.F.R. § 404.1520(g)(1). If the Commissioner fails to show the claimant is capable of performing other work, or if the claimant successfully rebuts the Commissioner's findings, the claimant is found to be disabled and is entitled to disability benefits. *Id*.

## IV.    PENDING ISSUES AND SUMMARY OF THE EVIDENCE

### A.    ALJ's Determination

On July 2, 2015, the ALJ found Plaintiff has not engaged in substantial gainful activity since June 1, 2011 and had the following medically determinable impairments: status post right wrist DeQuervain's tenosynovitis,[2] heart murmur, sinusitis, headaches, high cholesterol, right shoulder rotator cuff tear, right shoulder degenerative joint disease, right shoulder bursitis, thoracic and lumbar spine degenerative disc disease and vitamin D

---

[2]DeQuervain's Syndrome, known as "Washerwoman's Sprain," is defined as "stenosing tenosynovitis of the short extensor…and long abductor tendon…of the thumb." *Benjamin v. Astrue*, No. 6-1917, 2008 WL 731198, at *8 (W.D. La. Feb. 25, 2008) (citation omitted).

deficiency. (D.E. 5-3, Page 24). The ALJ also found Plaintiff's alleged anxiety disorder was a non-medically determinable impairment. (D.E. 5-3, Page 25). The ALJ further found at Step Two that Plaintiff did not have a severe impairment or combination of impairments that has significantly limited (or is expected to significantly limit) the Plaintiff's ability to perform basic work-related activities for 12 consecutive months. (D.E. 5-3, Page 25). Accordingly, the ALJ found Plaintiff has not been under a disability, as defined in the Social Security Act, from June 1, 2011, through the date of his July 2, 2015 opinion. (D.E. 5-3, Page 30).

### B.    Issues Presented

Plaintiff alleges the ALJ's decision that Plaintiff's impairments cause no limitations of her ability to work is contrary to law and not supported by substantial evidence. (D.E. 7, Page 4). Plaintiff asserts (1) her physical impairments cause more than minimal limitations; the ALJ failed to consider the effect of her combined impairments; and the ALJ improperly discounted Plaintiff's credibility; and (2) she is financially incapable of seeking and following through with treatment and, as a result, the ALJ did not fully develop the record of regarding her physical and mental impairments because he did not request a consultative examination.

### C.    Summary of the Evidence[3]

On April 5, 2010, Plaintiff was treated by Dr. Christopher Miskovsky. (D.E. 5-8, Pages 3-4). Plaintiff reported having right wrist pain for several years causing pain with

---

[3]The following is a summary of Plaintiff's treatment records contained in the administrative record filed with the Court. The undersigned has referenced each time these records indicate Plaintiff was treated.

gripping, twisting and lifting. (D.E. 5-8, Page 3). It was noted there was evidence of a left wrist dorsal cyst with no reported pain in this area. (D.E. 5-8, Page 3). Plaintiff reported no significant numbness or tingling in her hands and no significant night pain. (D.E. 5-8, Page 3). Plaintiff reported smoking a half of pack of cigarettes daily and no alcohol use. (D.E. 5-8, Page 3). Dr. Miskovsky noted Plaintiff was a "well appearing female in no apparent distress." (D.E. 5-8, Page 3). He further noted Plaintiff's elbows, wrists, and hands all had a near full range of motion without significant pain in her elbows, some tenderness in the right wrist, and a small left wrist dorsal ganglion cyst which was not tender to palpation. (D.E. 5-8, Page 3). X-rays of Plaintiff's right wrist showed no abnormalities or evidence of fracture dislocation, and no significant degenerative changes. (D.E. 5-8, Page 4). Plaintiff was diagnosed as having DeQuervain's tenosynovitis in her right wrist and was given an injection. (D.E. 5-8, Page 4). Plaintiff was advised to continue using a right thumb splint and to return on an as needed basis should she have any further problems. (D.E. 5-8, Page 4).

Just over two years later, on June 6, 2012, Plaintiff reported she had been in a car accident on June 5, 2012, having been rear ended at a red light, and was developing minor soreness in her right shoulder and neck. (D.E. 5-8, Page 27). Plaintiff is noted as having some decreased range of motion in the cervical spine with no soft tissue tenderness or significant muscle spasm. Plaintiff's neck is also noted as fully mobile with no bony point tenderness, mild to moderate spasm, and no evidence of distal weakness. Additionally, Plaintiff is noted as having a full range of motion in all extremities. (D.E. 5-8, Page 27). Plaintiff was diagnosed with whiplash (cervical strain),

prescribed one week of Flexeril and advised to apply heat to any affected areas. (D.E. 5-8, Page 28).

On June 8, 2012, Plaintiff was treated by Donald Gwartney, a chiropractor. (D.E. 5-8, Page 6). Plaintiff again reported she was in a car accident on June 5, 2012. (D.E. 5-8, Page 6). Plaintiff further reported she had sore, tight muscles with pain as well as tingling/numbness in her arms and a headache. (D.E. 5-8, Pages 6-7). Plaintiff also reported she had hired an injury attorney. (D.E. 5-8, Page 6). Plaintiff is noted as having a decreased range of motion in the cervical spine as well as muscle tightness and pain upon palpation. Plaintiff was advised she needed three to four weeks of chiropractic care, three times a week, and should use hot/cold packs, electric muscle stimulation, massage and mechanical traction. (D.E. 5-8, Pages 6 and 24). Plaintiff was treated by her chiropractor approximately ten times in June 2012 and by July 2, 2012, she reported she had continued pain in her neck and right arm but felt improvement. (D.E. 5-8, Pages 12-22). On July 22, 2012, Plaintiff's chiropractor noted Plaintiff had been released from his care on July 3, 2012. (D.E. 5-8, Pages 8 and 10). He noted Plaintiff "made good progress with treatment, but still had some mild residual neck and upper back pain and may experience flare-ups in the future that may need to be addressed with additional care" specifically "[c]hiropractic care." (D.E. 5-8, Page 8).

Just over seven months later, Plaintiff was treated on February 26, 2013, by Dr. Mario Martinez with a chief complaint of severe headaches during the previous two weeks. (D.E. 5-8, Page 30). Plaintiff reported she had never before had a severe headache, smoked half a pack of cigarettes per day, and had limited sharp chest pain and

light headedness. Plaintiff was primarily assessed as having a murmur, sinusitis, and a headache. (D.E. 5-8, Pages 30-32). However, a CT examination of the paranasal sinuses performed the same day was normal with no evidence of sinusitis and a CT of the head was also noted as normal. (D.E. 5-8, Pages 39-40). Additionally, an echocardiography report noted Plaintiff's heart was noted as primarily normal with left ventricular ejection fraction at 65 percent and mild mitral regurgitation. (D.E. 5-8, Pages 41-44). Dr. Martinez recommended Plaintiff continue taking over the counter pain medication for her headache and also prescribed Fioricet, used for treating tension headaches, for two months. (D.E. 5-8, Page 31).

Approximately five months later, on July 19, 2013, Plaintiff protectively filed her initial claim for disability insurance benefits. (D.E. 5-6, Pages 2-4 and D.E. 5-7, Page 5). Approximately three weeks later, on August 7, 2013, a disability report was created and Plaintiff reported she had stopped working on June 1, 2011. (D.E. 5-7, Page 6). Plaintiff reported she was not taking any medications and had last been seen for treatment of her listed ailments on November 1, 2012. (D.E. 5-7, Pages 7-8).

Plaintiff was treated by Dr. Orel Michael Everett on August 19, 2013 "for establishment of physician-patient relationship." (D.E. 5-8, Page 48). Plaintiff reported "generalized fatigue and aches and pains" and reported she was "considering attempting to get disability paperwork started up." (D.E. 5-8, Page 48). Plaintiff is noted as having a high stress level and anxiety and being pleasant, alert and oriented with no signs of edema in her extremities. Plaintiff reported she smokes 1/2 to 1 pack of cigarettes per day. Plaintiff was assessed as having myalgia and fatigue. (D.E. 5-8, Page 49). Dr.

Everett noted Plaintiff wanted "to wait on any further workup until we have the opportunity to see her previous labs."  (D.E. 5-8, Page 49).  She was not prescribed any medication and was scheduled for a two month follow up.  (D.E. 5-8, Page 49).

On August 26, 2013, Plaintiff completed a Function Report-Adult.  (D.E. 5-7, Pages 18-25).  Plaintiff reported she lived in a house with family.  (D.E. 5-7, Page 18).  She further stated she had to limit standing, lifting and sitting for long periods of time and was "unable to perform daily chores with ease."  (D.E. 5-7, Page 18).  Plaintiff reported her day consisted of waking and taking a hot shower to relieve her stiffness and soreness; light household chores including loading dishes in the dishwasher, wiping the table, light sweeping and light laundry; preparing meals on a daily basis for 30-45 minutes; handling household finances including paying bills; and then taking another hot shower before using over the counter liniments and going to bed.  (D.E. 5-7, Pages 19-20).  Plaintiff stated she had difficulty bending to put on her socks and shoes because of her back and neck pain, she could not take long showers or baths and could not shave, and was unable to prepare large meals because it required standing for too long and too much movement in her right arm and neck.  (D.E. 5-7, Pages 19-20).  Plaintiff also reported she always went outside; could drive or ride in a car; shopped online and in stores for clothes and household items every two to three weeks and would have someone accompany her to carry heavy items; went to church every Sunday but would have to get up one to two times each service; and could walk two blocks before needing to rest. (D.E. 5-7, Page 21-22).  Plaintiff reported she was taking Aleve for treatment of her ailments.  (D.E. 5-7, Page 25).

On October 3, 2013, a disability report was completed and Plaintiff reported no change in her ailments as well as no new physical limitations or ailments since her last disability report on August 7, 2013. (D.E. 5-7, Page 34). Plaintiff further stated she had not received any treatment for her ailments during this period and was taking no medication for treatment of her ailments. (D.E. 5-7, Page 35). The same was reported in the next disability report on October 31, 2013. (D.E. 5-7, Pages 43-44). Between these two reports, on October 17, 2013, Plaintiff was again treated by Dr. Everett. (D.E. 5-8, Page 46). She reported she "is stressed out and gets very anxious at times." (D.E. 5-8, Page 46). Plaintiff further reported she had panic attacks since childhood and being around strangers triggers these attacks. Additionally, Plaintiff reported she was not taking any medications and smoked a 1/2 to 1 pack of cigarettes per day. (D.E. 5-8, Pages 46-47). Plaintiff's electrocardiogram was normal. (D.E. 5-8, Page 47). Plaintiff was assessed as having a non-specific anxiety disorder and was prescribed three months of anxiety medication, referred to a mental health professional for evaluation, and scheduled for a follow up appointment in three months. (D.E. 5-8, Page 47).

About a year and a half later, a hearing was held on April 6, 2015 at which claimant and a vocational expert ("VE") testified.[4] (D.E. 5-3, Pages 35-75). At the time of the hearing, Plaintiff was 55 years old with a high school education. (D.E. 5-3, Page 43 and D.E. 5-7, Page 6). Plaintiff stated she had worked previously as a customer service representative and as a child care worker. (D.E. 5-3, Pages 45-46 and 48 and D.E. 5-7, Page 6). Plaintiff worked as a child care worker on a part time basis in 2012.

---

[4]The undersigned does not include the VE's testimony as the ALJ found Plaintiff was not disabled at Step Two.

(D.E. 5-3, Pages 49 and 51). Plaintiff testified she has insurance with a $50.00 co-pay but did not have the financial resources to continue physical therapy for her back after her car accident case settled or to seek any continuous medical treatment. (D.E. 5-3, Pages 55-58 and 61-62). Further, Plaintiff testified she did not seek available indigent medical services. (D.E. 5-3, Pages 57-58). Plaintiff also testified that her pain on a regular day was 5-6 on a scale of 10, she could not sit or stand on hard surfaces, and she wore Spanx every day to align her back. (D.E. 5-3, Pages 63-64). Plaintiff stated she left her customer service position because she could not sit for an eight to ten hour shift without having back spasms and radiating pain down her right side but she did not seek medical treatment during this time. (D.E. 5-3, Pages 65-69). Instead, Plaintiff testified she used heating pads, hot baths and medication to treat her ailments. (D.E. 5-3, Page 70). Plaintiff also stated she could take care of herself, including dressing, grooming, and bathing but could not sit and watch an entire movie without having a back spasm and pain radiating in her back, arm, and leg. (D.E. 5-3, Pages 71-72). Plaintiff further testified she could type for 30 to 40 minutes. (D.E. 5-3, Page 72).

On April 13, 2015, Plaintiff was treated by Dr. Martinez, with complaints of lower back pain radiating down her back to her hips and legs. (D.E. 5-8, Page 71). Plaintiff reported the pain was somewhat alleviated with rest, ibuprofen, warm baths, and a girdle. Plaintiff indicated her lower back pain was a six out of ten and her right shoulder pain was a five out of ten and that she could not lift her right arm above her head. (D.E. 5-8, Page 71). Dr. Martinez prescribed 600mg ibuprofen, 50 mg Tramadol and topical creams and recommended Plaintiff continue over the counter medication for her headaches.

(D.E. 5-8, Page 72). He further ordered diagnostic imaging of Plaintiff's back and right shoulder. (D.E. 5-8, Pages 72 and 73). X-rays of Plaintiff's spine showed straightening due to spasm, mild joint space narrowing and mild degenerative changes. (D.E. 5-8, Page 70). Right shoulder x-rays indicated very narrow joint space with mild degenerative changes. (D.E. 5-8, Page 70). An MRI of Plaintiff's right shoulder showed a right rotator cuff tear and mild osteoarthritis and bursitis. (D.E. 5-8, Page 69).

On May 21, 2015, Plaintiff had an initial evaluation by Dr. Bernard Seger for right shoulder and right side pain. (D.E. 5-8, Page 66). Plaintiff reported she had increasing pain in her neck and right shoulder since 2010 and was not sure how she injured herself. She also reported she has some numbness in her upper right side and right leg and could not lift her arm above her shoulder without pain. (D.E. 5-8, Page 66). Plaintiff further reported she was taking medication and using cream for her back pain, walked with her mother for exercise and "smokes a little bit every three days." Dr. Seger noted Plaintiff "looks very healthy," ambulated without an antalgic gate, had a slight limitation of range of motion of the cervical spine without significant pain with cervical compression, and a full range of motion on her upper left side and limited on her right. (D.E. 5-8, Page 67). After reviewing x-rays of Plaintiff's shoulder, Dr. Seger noted Plaintiff had mild joint arthropathy with no specific degenerative changes, loss of normal cervical lordosis with no marked spurring and evidence of significant spasm of the cervical spine. (D.E. 5-8, Pages 67). He further reported an MRI showed a small rotator cuff tear in Plaintiff's right shoulder. (D.E. 5-8, Page 67). Dr. Seger recommended "conservative treatment" to include Prednisone, physical therapy for her neck and shoulder, and continued walking.

(D.E. 5-8, Page 67).  He noted there was a "50/50 chance that she will need to move forward with arthroscopic intervention." (D.E. 5-8, Page 67).

## V.    ANALYSIS

### A.    The ALJ properly considered Plaintiff's physical impairments, the combined effect of her impairments, and Plaintiff's credibility

Plaintiff first asserts her physical impairments caused more than minimal limitations, the ALJ failed to consider the effect of her combined impairments, and the ALJ improperly discounted Plaintiff's credibility. (D.E. 7, Pages 5-12 and 18-23).  In support of this argument, Plaintiff cites to the medical records regarding Plaintiff's diagnosis of DeQuervain's tenosynovitis in April 2010, motor vehicle accident injuries in June 2012 and corresponding chiropractic treatment in June and July 2012,[5] headache treatment in February 2013, anxiety treatment in October 2013, and treatment of her back and shoulder pain in April and May 2015. (D.E. 7, Page 5-10).

However, the ALJ thoroughly reviewed all of these treatment records in his decision, ultimately finding Plaintiff did "not have an impairment or combination of impairments that has significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months; therefore the [Plaintiff] does not have a severe impairment or combination of impairments." (D.E. 5-3, Page 25).

---

[5]In support of her argument, Plaintiff also cites to the April 13, 2015 treatment record by Dr. Martinez where Plaintiff reported she had a back injury while working sometime in the 1990s. (D.E. 7, Page 6 and D.E. 5-8, Page 71).  However, there is no corresponding medical report for this injury or any of the treatment records following this injury.

The ALJ correctly noted that while Plaintiff was diagnosed with DeQuervain's wrist in April 2010, x-rays showed no significant degenerative changes and there were no further complaints of symptoms associated with this ailment in the record. (D.E. 5-3, Page 26). Additionally, while reviewing Plaintiff's treatment records from June and July 2012 following her motor vehicle accident, the ALJ correctly noted that Plaintiff was diagnosed with whiplash and is noted as having some decreased range of motion in the cervical spine with no soft tissue tenderness or significant muscle spasm with a full range of motion in all extremities. (D.E. 5-3, Pages 26-27; D.E. 5-3, Pages 26-27 and D.E. 5-8, Page 27). The ALJ also noted Plaintiff was discharged from treatment in July 2012 and was noted as having "made good progress with [chiropractic] treatment" but still having some mild residual neck and upper back pain. (D.E. 5-3, Page 27 and D.E. 5-8, Page 8). When reviewing the next treatment report in the record from February 2013, the ALJ correctly found Plaintiff made no complaints of neck, back or shoulder pain and, regarding her headache complaints, Dr. Everett prescribed over the counter Aleve, Motrin Migraine and Fioricet, and a head CT scan was normal. (D.E. 5-3, Page 27).

Reviewing Plaintiff's next treatment record from six months later, on August 19 2013, the ALJ correctly noted Plaintiff complained to Dr. Everett of "generalized fatigue and aches and pains." (D.E. 5-3, Page 27 and D.E. 5-8, Page 48). The ALJ further noted Plaintiff refused any additional laboratory testing at that time because her medical records were being transferred from her old physician. (D.E. 5-3, Page 27 and D.E. 5-8, Page 49). Plaintiff reported to Dr. Everett that she was "considering attempting to get disability paperwork started up;" however, Plaintiff had protectively filed her initial claim

for disability insurance benefits one month earlier, on July 19, 2013. (D.E. 5-6, Pages 2-4). Further, in a disability report created on August 7, 2013, less than two weeks before her appointment with Dr. Everett, Plaintiff reported she was not taking any medications. (D.E. 5-7, Pages 7-8). Plaintiff further reported to Dr. Everett that she was not taking any medications. (D.E. 5-8, Page 48).

As to Plaintiff's alleged mental health ailment, the ALJ noted that when Plaintiff was again treated by Dr. Everett two months later, on October 17, 2013, she reported she "is stressed out and gets very anxious at times." (D.E. 5-3, Page 27 and D.E. 5-8, Page 46). Plaintiff was prescribed Sertraline and was referred to a specialist for anxiety/panic attacks, however, the ALJ correctly notes "she never did seek out psychiatric care and receive an actual confirmed diagnosis of an anxiety disorder." (D.E. 5-3, Page 25). He also noted Plaintiff again reported to Dr. Everett that she was not taking any medications at that time and made no complaints of having pain symptoms. (D.E. 5-3, Page 27 and D.E. 5-8, Pages 46-47).

The ALJ then states the "medical record is then silent all the way [from October 2013 to] April 2015 when the [Plaintiff] complained of having low back pain with radiation into her hips and legs, and right arm pain" which was alleviated with rest. (D.E. 5-3, Page 27 and D.E. 5-8, Page 71).[6] The ALJ noted Dr. Martinez prescribed ibuprofen, Tramadol and topical creams and recommended Plaintiff continue over-the-counter

---

[6]During this time, Plaintiff was denied security disability benefits initially and upon reconsideration. Plaintiff was treated by Dr. Martinez one week after the April 6, 2015 hearing before the ALJ. (D.E. 5-3, Pages 35-75). During the hearing, both Plaintiff's attorney and the ALJ advised Plaintiff there was no corroboration for her alleged symptoms. (D.E. 5-3, Pages 61-63 and 71-72).

medication for her headaches, and that x-rays of Plaintiff's spine and shoulders showed straightening due to spasm, mild joint space narrowing, mild degenerative changes throughout, a right rotator cuff tear, mild joint arthritis and bursitis. (D.E. 5-3, Page 28 and D.E. 5-8, Pages 69-71). When reviewing Plaintiff's May 21, 2015 treatment note, the ALJ noted Plaintiff, who complained of increasing pain in her neck and right shoulder, was noted as pleasant and healthy looking, ambulating without an antalgic gate, having a slight limitation of range of motion of the cervical spine without significant pain with cervical compression, and a full range of motion on her upper left side and limited on her right. (D.E. 5-3, Page 28 and D.E. 5-8, Page 67). The ALJ noted Plaintiff was found to have a small rotator cuff tear in her right shoulder and was treated conservatively. (D.E. 5-3, Page 28 and D.E. 5-8, Page 67). The ALJ noted that, "Significantly, no treating physician has expressed an opinion regarding the [Plaintiff's] ability to perform work related functions." (D.E. 5-3, Page 29).

When considering Plaintiff's credibility, the ALJ also thoroughly reviewed Plaintiff's Function Reports as well as her testimony and found her reported daily activities, including driving, cooking, shopping, attending church and light household chores, as well as her methods for managing pain, more specifically taking over the counter medications, heating pads and hot baths, did "not comport with her complaints of disabling pain and physical limitations. In addition, the medical objective medical evidence does not support the [Plaintiff's] level of pain in her neck, back and right arm." (D.E. 5-3, Pages 28-29.) The ALJ further noted that in spite of Plaintiff's testimony that she could not afford medical care, she had insurance with a $50.00 co-pay and she

"should be able to see a doctor especially if her symptoms are of a severe nature. The [Plaintiff] has not received the type of treatment one would expect for a person claiming total disability." (D.E. 5-3, Page 29 and D.E. 5-3, Pages 55-58 and 61-62); *McKnight v. Astrue*, 340 F. App'x 176, 181 (5th Cir. 2009) (an ALJ's credibility evaluation is generally entitled to considerable deference by the Court); *Luckey v. Astrue*, 458 F. App'x 322, 326 (5th Cir. 2011) (ALJ is required to review the entire record, resolve conflicts in the evidence and state specific reasons for his credibility findings, supported by the evidence); *Tate v. Colvin*, No. 13-6552, 2014 WL 4982662, at * 16 (E.D. La. Oct. 6, 2014) (citations omitted) (ALJ's explanation of her reasons for finding a plaintiff not entirely credible is all that is necessary). The ALJ concluded that, "In sum, the [Plaintiff's] physical and mental impairments, considered singly and in combination, do not significantly limit [her] ability perform basic work activities. Thus, [she] does not have a severe impairment or combination of impairments." (D.E. 5-3, Page 30). In short, the ALJ thoroughly reviewed the entire medical record and noted several times that he considered Plaintiff's impairments both singly and in combination. (D.E. 5-3, Pages 25 and 29).

Plaintiff also asserts the ALJ failed to consider the Plaintiff's "extremely positive work history." (D.E. 7, Pages 18-22). However, the undersigned notes an ALJ is not required to explicitly discuss every piece of evidence in the record nor must the ALJ follow formalistic rules of articulation. *See Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994) ("That [the ALJ] did not follow formalistic rules in his articulation compromises no aspect of fairness or accuracy that this process is designed to ensure."); *see also*

*Castillo v. Barnhart*, 151 F.App'x 334, 335 (5th Cir. 2005) (per curium) ("That the ALJ did not specifically cite each and every piece of medical evidence considered does not establish an actual failure to consider the evidence.") (citation omitted); *see also Hammond v. Barnhart*, 124 F. App'x 847, 851 (5th Cir. 2005) ("[An] ALJ's failure to mention a particular piece of evidence does not necessarily mean that he failed to consider it," and "there is no statutorily or judicially imposed obligation for the ALJ to list explicitly all the evidence he takes into account in making his findings…") (citation omitted).

Here, the ALJ properly considered Plaintiff's description of her limitations regarding her ability to work and considered her work history when making a credibility determination. (D.E. 5-3, Pages 28-29). While he did not detail her entire work history in his decision, he questioned Plaintiff's attorney and Plaintiff at length during the hearing about her work history from 2000 forward, specifically stating Plaintiff had "good earnings in 2001 and '02. Good earnings in '06, '07, '08, '09, and '10. And, frankly, I see good earnings continuing into '11 and '12." (D.E. 5-3, Pages 44-47). Further, Plaintiff's attorney questioned Plaintiff at length about her work history. (D.E. 5-3, Pages 47-51). Additionally, the ALJ states he considered all of the evidence of record. (D.E. 5-3, Page 30).

Therefore, the undersigned recommends the ALJ's decision that Plaintiff's impairments were not severe is supported by substantial evidence.

**B.     The ALJ properly developed the record**

Plaintiff also asserts she is financially incapable of seeking and following through with treatment and, as a result, had a sporadic treatment history.  (D.E. 7, Pages 12-18). Plaintiff argues the ALJ did not fully develop the record regarding her physical and mental impairments because he did not request a consultative examination.  (D.E. 7, Pages 12-18).  However, the undersigned recommends this claim is without merit.

"The ALJ owes a duty to a claimant to develop the record fully and fairly to ensure that his decision is an informed decision based on sufficient facts."  *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996) (citation omitted).  "Generally, however, the duty to obtain medical records is on the claimant."  *Gonzalez v. Barnhart*, 51 F. App'x 484 (5th Cir. 2002) (the ALJ, who made numerous inquiries regarding [claimant's] medical condition and employment history, did not fail to develop the record by not ordering a consultative examination and a consultative examination was not necessary to enable the ALJ to make a disability determination).  The burden of proof lies with the Plaintiff to prove disability under the first four steps of the five-step inquiry.  *Leggett*, 67 F.3d at 564.  The ALJ satisfied his duty to develop the record by thoroughly reviewing the objective medical records from Plaintiff's treating physicians and the State Agency physicians as well as considering Plaintiff's own testimony and Function Reports.  While Plaintiff argues the ALJ found the record to be deficient, when viewed in context, the ALJ and Plaintiff's attorney were noting Plaintiff had received only sporadic treatment and therefore, had very few medical records to support her alleged limitations.  (D.E. 5-3, Pages 38, 41, 56, 59-60, 62, and 66-67).

Further, to obtain a remand for an ALJ's failure to develop the record, Plaintiff must demonstrate she was prejudiced by the deficiencies she alleges. *Brock*, 84 F.3d at 728 (explaining Plaintiff "must show that he could and would have adduced evidence that might have altered the result") (citation omitted). Plaintiff has failed to make a sufficient showing of prejudice and points to no sufficient evidence that, had the ALJ developed the record further, would have been offered at the hearing and changed the result. The ALJ conducted a review of the entire record and used this information to determine Plaintiff was not disabled. The ALJ did not have a duty to request consultative examinations when the record already contained substantial evidence upon which to make a determination, including Plaintiff's lack of consistent treatment.

Additionally, to the extent Plaintiff argues the ALJ did not properly consider Plaintiff's financial inability to afford certain treatment, this argument is contradicted by the ALJ's references to Plaintiff's finances in his decision. (D.E. 5-3, Pages 26 and 29). Therefore, it is clear the ALJ considered Plaintiff's alleged inability to afford certain treatment as well as the objective medical evidence in the record. *See Cornett v. Astrue*, 261 F. App'x 644, 649 n.3 (5th Cir. 2008) (citing *Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990)) (ALJ was not precluded from relying on lack of treatment, even when a plaintiff alleges prompted by indigence, as an indication that subjective complaints were not credible when there was no evidence medical treatment would have alleviated alleged disability). Further, the ALJ correctly noted Plaintiff had medical insurance with a $50.00 co-pay. (D.E. 5-3, Page 29 and D.E. 5-3, Pages 55-58 and 61-62).

Even though the record illustrates Plaintiff suffers from several impairments, substantial evidence supports the ALJ's conclusion that Plaintiff's impairments did not prevent her from working. *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) ("[T]he test for disability under the Social Security Act is not satisfied merely because Plaintiff cannot work without some pain or discomfort. Plaintiff must show that she is so functionally impaired that she is precluded from engaging in substantial gainful activity.") (citations omitted).

## VI.    RECOMMENDATION

For the reasons stated above, it is respectfully recommended that Plaintiff's Motion for Summary Judgment be **DENIED**, the Commissioner's determination be **AFFIRMED**, and Plaintiff's cause of action be **DISMISSED**.

Respectfully submitted this 8th day of November, 2017.

Jason B. Libby
United States Magistrate Judge

<u>NOTICE TO PARTIES</u>

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to 28 U.S.C. § 636(b)(1)(c); Rule 72(b) of the Federal Rules of Civil Procedure; and Article IV, General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendations in a Magistrate Judge's report and recommendation within **FOURTEEN (14) DAYS** after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996)(en banc).